IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
July 9, 2014 Session

## JEREMIAH DAVID HAWK v.
## ERIKA LEIGH HAWK (RICKER)

**Appeal from the Chancery Court for Greene County**
**No. 20080278    Hon. Jon Kerry Blackwood, Senior Judge[1]**

_____

**No. E2013-02458-COA-R3-CV-FILED-AUGUST 26, 2014**

_____

This post-divorce appeal concerns a parenting plan that provided for equal time between the Parents, who subsequently filed competing petitions to modify, claiming that a material change in circumstances necessitated a change in the parenting plan. The trial court found that a change in circumstances had not yet occurred but awarded Mother approximately 12.5 days of additional parenting time after deciding that the Child should attend school in Mother's county. Father appeals. We affirm the trial court's decision.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and W. NEAL MCBRAYER, JJ., joined.

David L. Leonard, Greeneville, Tennessee, for the appellant, Jeremiah David Hawk.

K. Kidwell King, Jr. and Jerry W. Laughlin, Greenville, Tennessee, for the appellee, Erika Leigh Hawk (Ricker).

Matthew W. Sexton, Morristown, Tennessee, guardian ad litem for the minor.

_____

[1]Sitting by interchange.

## OPINION

## I. BACKGROUND

The Child at issue was born of the marriage between Erika Leigh Hawk (Ricker) ("Mother") and Jeremiah David Hawk ("Father") in October 2006. Mother and Father (collectively "the Parents") divorced in April 2009. Pursuant to agreement, the Parents equally split parenting time, with each parent receiving 182.5 days. Following the divorce, Father married Becky Hawk ("Stepmother"), while Mother married Gary Ricker ("Stepfather"). The relationship between the Parents was contentious, at best. Yet, they added the following provision to the parenting plan in recognition of the fact that the Child would attend school in the future:

> The parties shall work together with the aim of mutually deciding upon the [C]hild's school. If the parties are unable to agree upon the [C]hild's school, the court shall decide said issue upon a proper request to do so.

At that time and at the time of the hearing at issue, Father lived in Knox County, while Mother lived in Greene County.

The agreement remained in place without controversy until Mother filed a petition to modify in February 2010, alleging in pertinent part, that the Child was supervised by Father's parents during his parenting time and that the Child suffered stress from this arrangement. Mother requested designation as the primary residential parent. Father responded by denying any wrongdoing and filing his own petition to modify, alleging that he provided structure that the Child could not receive from Mother, who was incapable of raising the Child and providing a stable existence. Father requested designation as the primary residential parent.

During the pendency of the hearing, Mother filed a motion to enroll the Child into the school of her choice. Following a hearing on the motion and the competing petitions to modify, the trial court denied Mother's request to enroll the Child in her chosen school and held that a material change in circumstance had occurred that necessitated a change in the parenting plan. The court found that a "significantly broken relationship" existed between the Parents, who could not "cooperate in making joint decisions regarding significant issues, including the location of the [C]hild's school enrollment" and that Father maintained a "greater willingness and ability to facilitate and encourage a close and continuing parent/child relationship between the [C]hild and the other parent than does [Mother]." The court likewise found that a modification of the parenting was in the Child's best interest. The court entered a temporary parenting plan in which Father was designated as the primary residential parent "on a temporary basis" and Mother was awarded reasonable visitation.

Mother filed a motion to alter or amend the trial court's decision. Prior to the court's ruling upon the motion, the Honorable Thomas R. Frierson, II, Chancellor found that sufficient grounds existed for his judicial recusal and entered an order providing that he "shall not adjudicate any issues joined in this cause." The Honorable Jon Kerry Blackwood, Senior Judge was eventually appointed to hear the action. The trial court found that the best course of action was to essentially hear the case anew before issuing a decision.

Prior to the hearing, Mother submitted an amendment to her proposed parenting plan in which she acknowledged the initial agreement to submit the decision regarding schooling to the trial court if she and Father could not agree. She asserted that the trial court need only decide which school was more appropriate and then restructure the parenting plan schedule to accommodate the chosen school schedule, thereby allowing her and Father to continue exercising equal parenting time. She acknowledged that one parent would exercise visitation with the Child during the week, while the other would exercise visitation on almost every weekend and holiday.

At the hearing, Mother testified that she had two children, the Child at issue and Austin, who was sixteen years old. She stated that when she and Father divorced, they exercised visitation with the Child every other week. She asserted that she enrolled the Child in Doak Elementary's pre-kindergarten program in Greeneville but that the Child never attended because Father objected to the school. The next year, she proposed enrollment in Doak's kindergarten program. This time, Father agreed but also enrolled the Child in Concord Christian School ("Concord") in Knoxville. The Child attended both schools until the temporary parenting plan was entered. She related that since that time, she hoped that the Child could attend Towering Oaks Christian School ("Towering Oaks") in Greeneville. She claimed that she had met with the school director and visited the school.

Mother testified that if the Child were placed with her during the week, she would be able to take the Child to and from Towering Oaks, which was approximately five miles from her home. She believed that establishing a weekday morning routine with the Child was an important aspect of his life. She asserted that she was more than willing to care for the Child during those times even if it meant spending less time with him on the weekends. She related that she was also available to care for the Child during the day if he were ill or if the school were closed due to inclement weather. She stated that in addition to her friends and family, she would be willing to accept help from Father's parents because she believed it was important for the Child to maintain his relationships with Father's family. She claimed that the Child also enjoyed a healthy relationship with his half-brother, Austin. She related that Austin helped with the Child and had established a close relationship with him.

-3-

Mother testified that since the temporary parenting plan was filed, Stepmother cared for the Child in the mornings because Father left for work before the Child was awake. She related that as a result of the Child's extensive time with Stepmother, the Child referred to Stepmother as "Mommy." She stated that Father was unresponsive when she confronted him about the issue. She claimed that in an effort to maintain her relationship with the Child, she occasionally volunteered at Concord, which was approximately 90 miles from her home. She denied staying at the school for an unreasonable amount of time and upsetting the Child during his lunchtime.

Mother testified that despite her willingness to remain involved, Father had not included her on the Child's application to Concord and had enrolled the Child in Tae Kwon Do classes in Knoxville. She attempted to enroll the Child in Tae Kwon Do at a location close to her home because it was inconvenient to transport the Child to Knoxville for his classes when she was exercising visitation. She claimed that Father refused to let the Child attend classes at her location because he did not want the Child to participate without his involvement. She acknowledged that the current parenting plan allowed Father to unilaterally make decisions regarding the Child's educational and extracurricular activities. She denied planning a trip to El Salvador with the Child without Father's consent.

Mother acknowledged that at one time, she asserted that the Child feared Father. She explained that the Child's relationship with Father had progressed. She conceded that she had taped conversations she had with Father, Stepmother, and the Child. She admitted that she and Father had difficulties communicating and that she had argued with Stepmother on occasion and had threatened to "f**k her up" when she learned that Stepmother smacked the Child on the leg. She claimed that she could provide the structure the Child needed if he lived with her during the week and with Father on the weekends. She acknowledged that the Child had excelled while in Father's care but stated that as the mother, she was better suited to care for the Child in the mornings than Stepmother.

Stepfather testified that in addition to the Child, he had two children. He related that his children were grown and did not live with him, Mother, Austin, and the Child. He claimed that Austin and the Child had a good relationship and that Mother was great with both children. He related that Mother provided structure and stability for the Child, who appeared happy when spending time with Mother. He admitted that the Child referred to him as "Daddy Gary" and that he had visited the Child at Concord. He denied upsetting the Child while at Concord.

Austin testified that he lived with Mother, Stepfather, and the Child. He related that he was doing well in school and was involved in several extracurricular activities. He

claimed that Mother was influential in his life and had really helped him to excel. He believed that Mother also had a good relationship with the Child.

Joseph Garner, Father's friend and pastor at Missions at First Baptist Concord in Knoxville, Tennessee, testified that he spent time with Father and the Child before and after the temporary parenting plan was filed. He claimed that prior to the Child's placement with Father, the Child appeared overly attached to Father and "unsettled." He asserted that after the Child's placement with Father, the Child appeared more secure and comfortable. He believed that Father and the Child enjoyed a close bond.

Stepmother testified that she lived with Father and the Child in a three-bedroom home, where the Child had his own room and bathroom. She stated that the Child and Father had a very close relationship and that she also enjoyed a close relationship with the Child, who referred to her as "Mommy Becky." She acknowledged that she spent each morning with the Child because Father left in the morning for work. She was responsible for ensuring that the Child was ready for school and then taking the Child to school on her way to work. She stated that Father retrieved the Child from school in the afternoon and was able to spend the afternoons and evenings with the Child. She believed that the Child had "thrived" since the entry of the temporary parenting plan and that the Child was "very happy" attending Concord with his friends.

Stepmother claimed that she and Father attempted to include Mother in the Child's activities at Concord and that they even sat with Mother during the Child's kindergarten graduation ceremony. She asserted that at times, Mother was unresponsive to their attempts to include her and that Mother was often hard to work with when making decisions for the Child. She acknowledged that she and Father enrolled the Child in Concord and neglected to even list Mother as a contact person on the application.

Carolyn Wilds, Stepmother's mother, testified that she had observed the Child with Father. She believed that Father and the Child "get along great" and that it was clear that they loved each other. She recalled that Father helped the Child with his homework and also played with the Child. She claimed that the Child was doing well since the entry of the temporary parenting plan.

Leigh Ledet, the elementary principal for Concord, testified that her school enrolled approximately 400 students and employed approximately 55 employees. She related that Concord was founded 17 years ago and currently operated at First Baptist Concord. She stated that the student to teacher ratio for the kindergarten program was 14 or 15 students per teacher, with the addition of an assistant who rotated between classrooms throughout the

week. She related that the teacher to student ratio for the first grade program was approximately 16:1.

Ms. Ledet testified that Father enrolled the Child, who had "done really well academically" and seemed "to just be excelling" the summer before kindergarten started. She recalled that Father advised her of the parenting time arrangement and the fact that the Child also attended another school while in Mother's care. She claimed that she advised Father to only provide contact information for those caring for the Child while Father was exercising visitation. She stated that she had also met with Mother, who volunteered at Concord, to discuss the excessive amount of time Mother spent while visiting. She acknowledged that her meeting with Mother went well and that Mother had complied with her recommendations.

Tabatha Hutson, the Child's kindergarten teacher at Concord, testified that the Child had done really well in her class and had made several friends. She recalled that Father and Mother had both volunteered while the Child was in her class. She observed a "good healthy relationship" between the Child and Father, but she believed that the Child was "stressed out" and a "little aggressive" when Mother was present in her classroom. She also noticed a difference in the Child when he returned to school after visiting Mother on the weekends. She recalled an incident in which she observed the Child hit Stepfather several times while Mother and Stepfather visited the Child. She asserted that the Child was upset when he returned to class after having lunch with Mother and Stepfather. She stated that Mother often volunteered at Concord and had attempted to sign up for every volunteer opportunity available. She believed that at first, Mother stayed for an excessive amount of time while volunteering. She acknowledged that Mother's visitation improved after Mother met with her and Ms. Ledet to discuss the issue.

Matt Howell, Father's friend, testified that he observed a "loving relationship" between the Child and Father. He related that the Child had progressed over the years and had even befriended his special needs son.

Father testified that he worked from 5:30 a.m. until 2:00 p.m. every day at the Watts Bar Nuclear Power Facility. He stated that when the Child was in his care, Stepmother took the Child to school in the mornings. He retrieved the Child in the afternoons and spent time helping him with his homework. He believed that the current schedule was beneficial for the Child. He asserted that his boss provided him with the flexibility he needed to remain involved with the Child's educational activities. He opined that Mother's proposed parenting plan would cause one parent to miss the educational aspect of the Child's life, while the other parent would not have as many opportunities to spend quality time with the Child doing activities outside of school. He explained that the Child would also miss activities with his

friends from school on the weekends because he would be in another city with the parent exercising visitation. He related that the Child was "very energetic" and loved to play outside and also really enjoyed Tae Kwon Do class. He claimed that Stepmother often facilitated activities for the Child and his friends either at the park, the zoo, or the movie theater on the weekends.

Father acknowledged that he enrolled the Child at Concord without listing Mother as a contact person on the application form. He explained he completed the form as he was instructed after informing Ms. Ledet of the Child's current custody arrangement. He believed that the Child improved academically once the Child was able to attend Concord on a full-time basis. He claimed that prior to the entry of the temporary parenting plan, the equally shared visitation time with Mother was confusing for the Child, who was not provided with as much structure at Mother's house. He related that the Child loved the responsibility and structure provided at his house.

Father claimed that the Child was distant, unable to communicate, and confused after returning from visitation with Mother. He stated that he received "hours upon hours" of tape recorded conversations from Mother, who had recorded her conversations with the Child and others. He acknowledged that the Child often expressed hesitation about leaving Mother for visitation, but he asserted that in the recordings, Mother announced that the Child needed to leave for visitation while the Child was playing his favorite video game or watching television. He related that unlike Mother, he often prepared the Child in advance for his visitations with Mother. He explained that the Child was a "planner" and wanted to know the schedule of events for the day. He believed that Mother intentionally upset the Child in order to ruin his visitation. He claimed that Mother also threatened to harm Stepmother after she learned that Stepmother had smacked the Child on the leg. He asserted that Mother often scheduled activities for the Child without his knowledge even though he was designated as the one with the decision making authority. He related that he was hesitant about allowing the Child to attend a different Tae Kwon Do class while with Mother because instructors may have competing philosophies regarding the appropriate use for Tae Kwon Do. He stated that Mother also failed to provide the Child with the appropriate structure to excel in extracurricular activities.

Following the presentation of the above evidence, the trial court determined that a material change in circumstance had not yet occurred when the Parents each provided excellent care for the Child and neither parent had failed to adhere to either the original or temporary parenting plan. The court noted that while such a change had not occurred, the court needed to designate a school for the Child as anticipated in the original parenting plan. The court designated Towering Oaks in recognition of the fact that Mother was able to care for the Child prior to the school day, while Father was unable to consistently perform these

tasks due to his work schedule. In so concluding, the court ordered the Parents to submit a parenting plan providing that the Child was to remain in Mother's care while attending school and that Father was to exercise visitation each weekend and during designated school breaks, thereby designating Mother as the primary residential parent and providing her with 195 days of parenting time and Father with 170 days of parenting time. This timely appeal followed.

## II. ISSUE

We restate the issues raised on appeal by Father as follows:

Whether the trial court erred in finding that a material change in circumstance had not occurred.

## III. STANDARD OF REVIEW

On appeal, the factual findings of the trial court are accorded a presumption of correctness and will not be overturned unless the evidence preponderates against them. *See* Tenn. R. App. P. 13(d). The trial court's conclusions of law are subject to a de novo review with no presumption of correctness. *Blackburn v. Blackburn*, 270 S.W.3d 42, 47 (Tenn. 2008); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). Mixed questions of law and fact are reviewed de novo with no presumption of correctness; however, appellate courts have "great latitude to determine whether findings as to mixed questions of fact and law made by the trial court are sustained by probative evidence on appeal." *Aaron v. Aaron*, 909 S.W.2d 408, 410 (Tenn. 1995).

In matters of child custody, trial courts are vested with broad discretion, and appellate courts will not interfere with the trial court's decision except upon a showing of erroneous exercise of that discretion. *See Whitaker v. Whitaker*, 957 S.W.2d 834, 836-37 (Tenn. Ct. App. 1997). "'Because [c]ustody and visitation determinations often hinge on subtle factors, including the parents' demeanor and credibility during . . . proceedings," appellate courts "are reluctant to second-guess a trial court's decisions.'" *Hyde v. Amanda Bradley*, No. M2009-02117-COA-R3-JV, 2010 WL 4024905, at *3 (Tenn. Ct. App. Oct. 12, 2010) (quoting *Johnson v. Johnson*, 169 S.W.3d 640, 645 (Tenn. Ct. App. 2004)).

## IV. DISCUSSION

Father argues that the trial court erred in finding that a material change in circumstance had not occurred when Mother's failure to facilitate a bond between himself and the Child warranted his designation as primary residential parent. Mother responds by

asserting that a material change in circumstance had not occurred and that the trial court did not err in selecting Towering Oaks as the Child's school when she was able to care for the Child in the mornings, while Father's schedule was more limited. GAL argues that the court erred by amending the plan without finding a material change in circumstance. He asserts that a change in circumstance had occurred as evidenced by Mother's interference with Father's relationship with the Child and their inability to communicate. He opines that Father should be designated as the primary residential parent, thereby allowing the Child to remain at Concord, where the Child was clearly excelling as a student.

"A custody decision, once final, is res judicata upon the facts in existence or reasonably foreseeable when the decision was made." *Scofield v. Scofield*, No. M2006-00350-COA-R3-CV, 2007 WL 624351, at *3 (Tenn. Ct. App. Feb. 28, 2007) (citing *Young v. Smith*, 246 S.W.2d 93, 95 (Tenn. 1952)). However, because the circumstances of children and parents change, our courts are "empowered to alter custody arrangements when intervening circumstances require modifications." *Scofield*, 2007 WL 624351, at *2 (citing Tenn. Code Ann. § 36-6-101(a)(1)). Modification of an existing custody or visitation arrangement involves a two-step analysis. Tenn. Code Ann. § 36-6-101(a)(2)(B), (C). First, the parent attempting to modify the existing custody or visitation arrangement must prove that a material change in circumstances has occurred. Tenn. Code Ann. § 36-6-101(a)(2)(B), (C). "If a material change in circumstances has occurred, it must then be determined whether the modification is in the child's best interest[]." *Kendrick v. Shoemake*, 90 S.W.3d 566, 570 (Tenn. 2002) (footnote omitted).

The determination of whether a "material change in circumstance" occurred requires a different standard depending upon whether a parent is seeking to modify custody (i.e., change the primary residential parent) or modify the residential parenting schedule. Tenn. Code Ann. § 36-6-101(a)(2)(B), (C). The Tennessee Code establishes a lower threshold for modification of a residential parenting schedule. *Scofield*, 2007 WL 624351, at *3. The Code provides, in pertinent part,

> (B) If the issue before the court is a modification of the court's prior decree pertaining to custody, the petitioner must prove by a preponderance of the evidence a material change in circumstance. A material change of circumstance does not require a showing of a substantial risk of harm to the child. A material change of circumstance may include, but is not limited to, failures to adhere to the parenting plan or an order of custody and visitation or circumstances that make the parenting plan no longer in the best interest of the child.

> (i) In each contested case, the court shall make such a finding
> as to the reason and the facts that constitute the basis for the
> custody determination.

* * *

> (C) If the issue before the court is a modification of the court's prior decree
> pertaining to a residential parenting schedule, then the petitioner must prove
> by a preponderance of the evidence a material change of circumstance
> affecting the child's best interest. A material change of circumstance does not
> require a showing of a substantial risk of harm to the child. A material change
> of circumstance for purposes of modification of a residential parenting
> schedule may include, but is not limited to, significant changes in the needs of
> the child over time, which may include changes relating to age; significant
> changes in the parent's living or working condition that significantly affect
> parenting; failure to adhere to the parenting plan; or other circumstances
> making a change in the residential parenting time in the best interest of the
> child.

Tenn. Code Ann. § 36-6-101(a)(2)(B), (C). "There are no hard and fast rules for when there has been a change of circumstances sufficient to justify a change in custody." *Cosner v. Cosner*, No. E2007-02031-COA-R3-CV, 2008 WL 3892024, at *4 (Tenn. Ct. App. Aug. 22, 2008) (citing *Cranston v. Combs*, 106 S.W.3d 641, 644 (Tenn. 2003)). However, to determine whether a material change in circumstances has occurred, the court should consider whether:

> (1) the change occurred after the entry of the order sought to be modified; (2)
> the changed circumstances were not reasonably anticipated when the
> underlying decree was entered; and (3) the change is one that affects the
> child's well-being in a meaningful way.

*Cosner*, 2008 WL 3892024, at *4 (citing *Kendrick*, 90 S.W.3d at 570).

In this case, the trial court found that a material change in circumstance had not yet occurred. The court recognized that there were areas of misunderstanding and disagreement between the Parents but ultimately held that these episodes did not rise to the level of a material change in circumstance that necessitated a change in the parenting plan. We give great weight to the factual findings of the trial court which rest on determinations of witness credibility. *Randolph v. Randolph*, 937 S.W.2d 815, 819 (Tenn. 1996). We will not reevaluate an assessment of witness credibility absent clear and convincing evidence to the

-10-

contrary. *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999). Indeed, the record reflects that even though the Parents disagreed at times, each parent was equipped to care for the Child, who thrived in both homes and that neither parent failed to adhere to the parenting plan. Accordingly, we conclude that the trial court did not err in finding that a material change in circumstance that necessitated a change in the parenting plan had not occurred.

Nevertheless, we must address the fact that the trial court modified the custody arrangement and the residential parenting schedule by designating Mother as the primary residential parent and slightly adjusting the residential parenting time. The Parents tasked the trial court with designating the Child's school by including the following provision in the parenting plan at the time of the divorce:

> The parties shall work together with the aim of mutually deciding upon the [C]hild's school. If the parties are unable to agree upon the [C]hild's school, the court shall decide said issue upon a proper request to do so.

Once the trial court determined that a material change in circumstance had not occurred, Mother's request to designate the Child's school was before the court. We agree with the trial court that placement of the Child at Towering Oaks was reasonable given the fact that Mother's schedule was more conducive to providing liberal care and time with the Child in the mornings before school. *See generally Miller v. Miller*, 336 S.W.3d 578, 585 (Tenn. Ct. App. 2010) (awarding additional parenting time to mother, who was able to prepare the child for school each morning). While the court was careful to maintain the Parents' original intent to equally divide parenting time, small changes to the plan were necessary to facilitate the court's ultimate decision that the Child should attend Towering Oaks because Father lived a substantial distance from the designated school. With these considerations in mind, we affirm the decision of the trial court.

## V. CONCLUSION

The judgment of the trial court is affirmed, and the case is remanded for such further proceedings as may be necessary. Costs of the appeal are taxed to the appellant, Jeremiah David Hawk.

_____
JOHN W. McCLARTY, JUDGE

-11-